# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 14 2017, 6:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Glen E. Koch, II
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In re Termination of the Parent-Child Relationship of

B.D. (Minor Child)

and B.D. (Father)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

September 14, 2017

Court of Appeals Case No. 55A04-1703-JT-679

Appeal from the Morgan Circuit Court

The Honorable Matthew G. Hanson, Judge

Trial Court Cause No. 55C01-1605-JT-161

**Mathias, Judge.**

[1] The Morgan Circuit Court terminated B.D.'s ("Father") parental rights to his minor child. Father appeals and argues that the trial court's order terminating his parental rights is not supported by clear and convincing evidence.

[2] We affirm.

## Facts and Procedural History

[3] B.D. was born in May 2013. Father and L.J. ("Mother") were living together when B.D. was born, but the couple ended their relationship in August 2013. Father continued to visit with B.D. after he moved out of the house.

[4] In April 2014, shortly before B.D.'s first birthday, Father was incarcerated for violating his probation and for pending forgery charges. In September 2014, the Indiana Department of Child Services ("the DCS") received a report that Mother's home was unsanitary, she used heroin or methamphetamine daily, and B.D. was present during Mother's drug use. Father, who was still incarcerated, reported that he and Mother were heavy heroin users.

[5] B.D. was removed from Mother's care, and the DCS filed a petition alleging that he was a Child in Need of Services ("CHINS"). Mother admitted that she was unable to care for her child because she lacked a stable home and resources and abused illegal substances. Father was unable to care for B.D. due to his incarceration. B.D. was initially placed in a foster home, but he was later placed with his maternal grandparents.

[6] During the CHINS proceedings, Father was ordered to meet with the family case manager, notify the case manager of changes in address or phone number, refrain from illegal drug use and take random drug screens, and complete a substance abuse assessment upon his release from incarceration. While he was incarcerated, Father participated in services to the best of his ability.

[7] Father was released from jail on September 11, 2015, and he was placed on probation. Father participated in services and visitation with B.D. However, in January or February 2016, Father failed to meet with the case worker on several occasions. And Father's February 1, 2016 visitation was cancelled because he arrived at the visitation under the influence of drugs. Father took a drug screen that was positive for methamphetamine and amphetamine.

[8] Father failed to remain in contact with the DCS after February 9, 2016. In March 2016, Father violated his probation and was arrested for resisting law enforcement.

[9] On May 9, 2016, the DCS filed a petition to terminate Mother's and Father's rights to B.D. In July 2016, Mother signed a consent to allow B.D. to be adopted by her parents. The trial court held hearings on the DCS's petition to terminate Father's parental rights to B.D. on December 29, 2016, March 2, 2017, and March 15, 2017.

[10] The trial court issued its order terminating Father's parental rights to B.D. on March 20, 2017. In pertinent part the trial court found:

120. That it has been evident from the start of this case that drugs were an issue for both parents.

121. That father admitted to prior drug use during one of the first visits by DCS.

122. That while in jail at the time, there were limited resources for father to work on issues such as drug abuse and/or reunification with his child.

123. That the DCS testified that late into his first stint in jail, the father did work with a recovery coach from Centerstone and that father may have participated somewhat in a 12 step program (not offered through DCS).

124. That while in jail, there was a limited ability to visit with the child and or develop a relationship with the child.

125. That visits with young children have never been permitted by this court, at the jail, and therefore being able to work on relationships between a jailed parent and a young child are limited to letters or phone calls.

126. There is no evidence the father ever wrote letters or made phone calls during this first stint in jail, albeit the child was only between the age of one (1) and two (2) years.

127. On at least two occasions father was found in noncompliance only because of his inability to provide supervision for the child.

128. As father neared release and worked with Centerstone as well as the 12 step program, DCS began reporting father was compliant.

***

133. That upon his release in [September] 2015, the father immediately contacted DCS, was working in therapy and

homebound casework, was doing supervised visits and was doing drug screens.

*\*\**

140. That the father had set up an appointment for a mental health assessment, but the dates got moved and due to facts listed below, the assessment was never completed.

141. That DCS testified that up until January 2016 the father had been attending visits regularly and had completed home based services and recovery coaching services.

142. That in January of 2016 the father failed to show up to the scheduled CFTM meeting.

143. Thereafter the father also lost consistency with his visits.

144. That on February 1, 2016 the father showed up at a visitation with the child and was noticeably under the influence of something.

145. That testimony from father's probation officer showed the court that at a probation meeting on February 17, 2016, the father in fact admitted to drug use as far back as December of 2015, and on into the new year, 2016.

146. That thereafter the probation department required the father to get himself into a treatment program.

*\*\**

149. That father filled out paperwork for a program at Progress House but apparently never attended.

150. That father testified that he also attended a halfway house called Simply Devine for two (2) weeks but he left there of his own volition.

151. Father did contact DCS about other options and was given a referral to Harbor Lights.

152. That on February 28, 2016 the father admitted himself to Harbor Lights but checked himself out against medical advice on March 3, 2016.

153. That following father leaving Harbor Lights, the DCS had no further contact with him.

154. That the probation department held off on filing a violation of probation as father agreed to check himself into Valle Vista on March 10, 2016.

155. That father then checked himself out of Valle Vista on March 11, 2016.

156. That father testified that he left each of the facilities for no good reason and stated that it was because of his drug addiction.

157. That after leaving Valle Vista, the probation department filed a Motion for Revocation of Probation on March 15, 2016.

158. That it is evident that the father was simply playing a game bouncing in and out of rehabilitation facilities in order to avoid returning to jail.

159. That on March 28, 2016, the father was charged with resisting law enforcement after fleeing from officers that were trying to serve him with his probation revocation warrant.

160. That father has remained in the Morgan County jail to this day after pleading guilty to [] resisting law enforcement and thereafter admitting to violating his probation.

161. For these events, the father received jail time that will be finished on April 23, 2017.

Appellant's App. pp. 17–20.

[11] The trial court also discussed Father's enrollment in and graduation from a new drug and alcohol rehabilitation program available at the Morgan County Jail. The trial court found:

> 172. That it is obvious that the father is more than capable of following drug abuse programs/counseling as has been shown by his completion of the RSAP program and the testimony of the director of the RSAP program regarding father's progress.
>
> 173. However, this ability to participate and complete such programs also proves that such willingness to complete programs only takes place when he is locked down and essentially has no other options.
>
> 174. That as for stability, the father testified at the hearing that he is basically homeless, will be living with his grandmother when he gets out of jail in April of 2017, and will need to find work.

Appellant's App. p. 21.

[12] The trial court also found that Father loves his son, but has been in jail for over half of the child's thirty-four months of life. And Father "has been driven by his drug addiction and instability rather than doing what is best for his son to this point." Appellant's App. p. 21. Further, the court found that after he was released from jail in September 2015,

> 185. That father had resources available through DCS and probation that he availed himself of for a time and then he stopped.
>
> 186. That even after his drug failures the DCS and the probation attempted to get him help and it was evident thereafter that he

simply was going through the motions so as not to get arrested on a probation violation.

187. That even when father was stopped by the police, he once more continued to commit a crime, in that he fled from officers that were trying to arrest him on the probation warrant.

188. The crimes for which father was in jail for all during this case have nothing to do with drug abuse.

189. In fact, his first crimes from 2014 were crimes of dishonesty and his second was a crime against society as he simply fled when detained by police.

190. That while his drug use abuse is evident and there clearly is an ongoing issue with that, this court finds that drugs were not behind any of the criminal offenses and that therefore father simply is a person that commits crimes as well as abuses drugs.

191. This continuation of committing criminal offenses that are not drug related, suggests a lack of ongoing stability and danger on the part of the father.

192. The drug use and abuse to this point suggests a lack of stability and ability of the father to provide a safe and stable place for his child.

193. That the combined events of drug use and jail have prevented any attempts by the father to find work and therefore provide a home/safe living space.

Appellant's App. p. 22. The trial court also found that it is likely that B.D. does not know who Father is. Appellant's App. p. 23.

[13]    The trial court concluded that it is "the instability of the father to find work or a home, his continuing drug use, the continuing pattern of committing crimes and his return to incarceration that this court finds will not be remedied any

time soon." *Id.* The trial court also concluded that the DCS proved that there is a reasonable possibility that continuation of the parent child relationship poses a threat to B.D.'s well-being and that terminating Father's parental rights was in B.D.'s best interests. Father now appeals the trial court's order terminating his parental rights.

# Discussion and Decision

[14] The purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for their termination when the parties are unable or unwilling to meet their responsibilities as parents. *Id.* Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[15] Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
> > (i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[16] DCS must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1261. But because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of subsection 4(b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

[17] Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). It is instead sufficient to show by clear and convincing evidence that the child's emotional and physical development are put at risk by the parent's custody. *Id.* If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[18] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us

with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[19] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; accordingly, the trial court is required to find that only one prong of Section 4(b)(2)(B) has been established. *In re A.K.*, 924 N.E.2d at 220. Therefore, on appeal, we need only consider whether the DCS proved one prong of section 31-35-2-4(b)(2)(B) by clear and convincing evidence.

[20] Father argues that the DCS failed to prove that there is a reasonable probability that the conditions that resulted in B.D.'s removal or the reasons for placement outside of Father's home will not be remedied. In reviewing this determination, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must determine what conditions led to the child's removal. *Id*. And then we consider "whether there is a reasonable probability that those conditions will not be remedied.'" *Id*. (quoting *In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010)). The trial court must evaluate a parent's fitness at the time of the termination hearing, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *Id.*

[21] B.D. was removed from Mother because her home was unsanitary and she was using illegal substances, including heroin and methamphetamine. Father was

incarcerated when B.D. was removed from Mother's care. Father admitted to the DCS that both he and Mother were heavy heroin users. Upon his release from incarceration, Father complied with services and exercised visitation with B.D. for approximately five months. However, Father began using methamphetamine approximately three months after he was released from jail. He also violated his probation, and committed a new criminal offense. On the date of the termination hearing, Father was incarcerated.

[22]     Father relies on *K.E. v. Indiana Department of Child Services*., 39 N.E.3d 641 (Ind. 2015), to support his claim that the fact of his incarceration is insufficient to support a conclusion that there is a reasonable probability of non-remedy of the conditions for removal. However, *K.E.* is readily factually distinguishable from the instant case. In *K.E.*, our supreme court reversed the trial court's termination order of a father who was incarcerated at the time of the child's removal and remained so through the termination hearing. *Id.* at 647, 652. Although the father was not set to be released from incarceration for two years after the termination hearing, our supreme court found that the father had "made substantial efforts towards bettering his life" through his participation in twelve programs that were available during his incarceration that targeted parenting and life skills, along with addressing his substance abuse. *Id.* at 648–49. In addition, the father in *K.E.* maintained regular contact and visits with his child while incarcerated through visitation and nightly phone calls, and he testified that he had made arrangements for housing and employment upon his release. *Id.* at 647.

[23] In this case, Father had been participating in a new program at the jail, but the trial court found that "this ability to participate and complete such programs also proves that such willingness to complete programs only takes place when he is locked down and essentially has no other options." Appellant's App. p. 21. Father has not successfully addressed his substance abuse issues, and during his incarceration, he did not maintain contact with B.D. Moreover, the trial court found that Father's "continuation of committing criminal offenses that are not drug related, suggests a lack of ongoing stability and danger on the part of the father." *Id* at 22. For all of these reasons, and under our extremely deferential standard of review, we cannot say that the trial court clearly erred in determining that there was clear and convincing evidence establishing that there was a reasonable probability that continuation of the parent-child relationship posed a threat to B.D.'s well-being.[1]

[24] Father also argues that the trial court erred in concluding that termination of the parent-child relationship was in B.D.'s best interests. In determining what is in the best interests of the child, the trial court must look beyond the factors identified by the DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. The trial court must subordinate the interests of the parent to those of the child, and the court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id*. A recommendation

---

[1] Because the DCS presented clear and convincing evidence to prove this prong of the termination statute, we need not consider whether there is a reasonable probability that the continuation of the parent-child relationship poses a threat to B.D.'s well-being.

by the case manager or child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal or continued placement outside the parent's home will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id* at 1158–59.

[25] Here, Father has been incarcerated for over half of B.D.'s young life. Father has been offered numerous services both through the DCS and the Department of Correction and has failed to avail himself of those services. Father violated his probation, continued to use drugs, and committed a new criminal offense during these proceedings. Father has not established that he can refrain from using illegal substances or provide a stable life for his child. "[C]hildren cannot wait indefinitely for their parents to work toward preservation or reunification—and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship.'" *In re E.M.*, 4 N.E.3d 636, 648 (Ind. 2014) (quoting *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1235 (Ind. 2013)).

[26] Moreover, the CASA and the DCS family case manager testified that termination of Father's parental rights was in B.D.'s best interest. Tr. pp. 23, 61, 90–95. This evidence clearly and convincingly supports the trial court's conclusion that termination of Father's parental rights was in the best interests of the child. *See A.D.S.*, 987 N.E.2d at 1158.

# Conclusion

The DCS proved the statutory elements required to terminate Father's parental rights by clear and convincing evidence. Therefore, we affirm the trial court's order terminating Father's parental rights to B.D.

Affirmed.

Vaidik, C.J., and Crone, J., concur.